**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| MARIA R. RODRIGUEZ,<br><br>    Plaintiff,<br><br>   v.<br><br>JO ANNE B. BARNHART,<br>COMMISSIONER OF SOCIAL<br>SECURITY ADMINISTRATION,<br><br>    Defendant. | No. CV 05-3710-PLA<br><br>**MEMORANDUM OPINION AND ORDER** |

**I.**

**PROCEEDINGS**

  Plaintiff filed this action on May 23, 2005, seeking review of the Commissioner's denial of her  application for Disability Insurance Benefits.  The parties filed a Consent to proceed before the undersigned Magistrate Judge on October 19, 2005.  Pursuant to the Court's Order, the parties filed a Joint Stipulation on April 13, 2006, that addresses their positions concerning the disputed issues in the case.  The Court has taken the Joint Stipulation under submission without oral argument.

/

/

## II.

## __BACKGROUND__

Plaintiff was born on August 15, 1946. [See Administrative Record ("AR") at 27, 72, 397.] She attended three years of school in Mexico. [AR at 27, 127.]  Plaintiff has worked as a kitchen helper and sewing machine operator. [AR at 28, 107-08, 122, 138, 292, 397.]

On April 12, 1999,  plaintiff protectively filed her current application[1] for Disability Insurance Benefits,[2] alleging that she had been unable to work since April 26, 1998, due to bowel and abdominal obstruction, dizziness, vomiting, and inability to sit or walk for prolonged periods.  She alleged that she could not eat and that she passed out due to her pain.  [AR at 71, 72-74, 102.] Plaintiff also alleges depression and various musculoskeletal impairments, including two broken wrists from fainting "because of pain." [AR at 29, 111.]  After her application was denied initially and on reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). [AR at 44-47, 51-55, 56-58.]  The hearing was held on June 28, 2000,  at which time plaintiff appeared with counsel and testified on her own behalf. [AR at 26-35.]

On July 17, 2000, the ALJ determined  that plaintiff was not disabled.  [AR at 14-21.] The Appeals Council denied review [AR at 5-8], and plaintiff sought judicial review in this Court, ED CV 02-713-PLA.   The matter was remanded to the Commissioner pursuant to a stipulation between the parties. [AR at 436-37, 438-39.] The prior decision was vacated, and a second hearing was held on November 30, 2004, at which time plaintiff again appeared with counsel and testified. [AR at 442; AR at 890-98.] Also present and testifying was a vocational expert. [AR 898-909.]   The ALJ again found that plaintiff was not disabled by decision dated February 24, 2005. [AR at 396-400.]  No exceptions were filed, and the Appeals Council did not assume jurisdiction

---

[1]     Plaintiff  filed  prior applications in 1991 and 1994 which are final.  [AR at 15.]  She also filed an application on May 26, 1998, which was denied initially on November 17, 1998, and not appealed.  [AR at 67, 68-70; AR at 39-42.] The ALJ did not reopen that application. [AR at 15.] Accordingly,  the denial of disability through November 17, 1998, was final and binding. 20 C.F.R. § 404.905.

[2]     No application for Supplemental Security Income was filed because plaintiff had excess resources. [AR at 95-97.]

on its own motion.  Accordingly, the ALJ's decision became the final decision of the Commissioner after remand.  20 C.F.R. § 404.984.

### III.

### STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits.  The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards.  Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance -- it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." Moncada, 60 F.3d at 523; see also Drouin, 966 F.2d at 1257.  When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence.  Drouin, 966 F.2d at 1257; Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  Where the evidence is susceptible to more than one rational interpretation, the Court must defer to the decision of the Commissioner.  Moncada, 60 F.3d at 523; Andrews v. Shalala, 53 F.3d 1035, 1039-40 (9th Cir. 1995); Drouin, 966 F.2d at 1258.

### IV.

### THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months.  42 U.S.C. § 423(d)(1)(A); Drouin, 966 F.2d at 1257.

### A.    THE FIVE-STEP EVALUATION PROCESS

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. §§ 404.1520; Lester v. Chater, 81 F.3d 821, 828 n.5

(9th Cir. 1995, as amended April 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied.  Id.  If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  Id.  If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded.  Id.  If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform her past work; if so, the claimant is not disabled and the claim is denied.  Id.  The claimant has the burden of proving that she is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets this burden, a prima facie case of disability is established.  The Commissioner then bears the burden of establishing that the claimant is not disabled, because she can perform other substantial gainful work available in the national economy.  The determination of this issue comprises the fifth and final step in the sequential analysis.  20 C.F.R. §§ 404.1520; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

**B.    THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

The ALJ first found that plaintiff last met the insured status requirements of the Act on September 30, 1999. [AR at 399.] This means that plaintiff must establish that she has been continuously disabled since on or before that date.  Flaten v. Secretary of Health and Human Services, 44 F.3d 1453, 1458 (9th Cir. 1995).

Applying the five-step sequential evaluation process, the ALJ found that plaintiff asserted that she had not engaged in substantial gainful activity since the alleged onset date of disability, and the ALJ made no finding to the contrary.  [AR at 399.] At steps two and three, the ALJ concluded that plaintiff has "a questionably 'severe' impairment from her various subjective

4

complaints which does not approach Listing level severity and leaves [plaintiff] with the residual functional capacity[3] ("RFC") for at least light work[4] as that term is described under the Social Security Administration Regulations." [Id.]   At step four, the ALJ concluded that plaintiff is able to perform her past relevant work as a sewing machine operator. [Id.]  Accordingly, the ALJ found plaintiff not disabled. [AR at 400.]

## V.

## THE ALJ'S DECISION

Plaintiff contends that the ALJ failed to (1) properly consider the opinions of her treating physicians; (2) properly consider the existence of a mental impairment; and (3) properly consider plaintiff's own testimony.  For the reasons discussed below, the Court respectfully disagrees with plaintiff, and affirms the Commissioner's decision.

## A.     THE TREATING PHYSICIANS' OPINIONS

### 1.     Dr. Generoso Nery

On April 27, 2000, Dr. Nery completed two check-the-box questionnaires on plaintiff's behalf.  In the first questionnaire, entitled "Residual Functional Capacity Questionnaire," Dr. Nery is asked the "No. Hrs." (number of hours) in an eight-hour workday that plaintiff can sit, stand, walk, or work.  Instead of circling the appropriate number of hours, from 0 to 8, that plaintiff could perform each task, Dr. Nery circled "No." in each category, presumably meaning that plaintiff was unable to accomplish any of these tasks in an eight-hour workday. [AR at 294-95; see AR at 18.] Dr. Nery's responses to the "Physical Residual Functional Capacity Questionnaire" [AR at 296-302],  indicated that plaintiff could sit fifteen minutes, stand fifteen minutes and walk one block in a "competitive work situation."  Dr. Nery also opined that in an eight-hour workday with normal

---

[3]     Residual functional capacity is what a claimant can still do despite existing exertional and nonexertional limitations.  Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

[4]     "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. . . ."  20 C.F.R. § 404.1567(b).

1  breaks, plaintiff could sit and stand/walk for a total of "0" hours in an eight-hour workday.
2  However, she would have to include periods of walking for fifteen minutes every fifteen minutes
3  during an eight-hour workday. [AR at 299.] Plaintiff could never lift even less than ten pounds.
4  Dr. Nery believed that plaintiff was "unable to work at all." [AR at 300.]   According to Dr. Nery,
5  plaintiff had right lumbar pain, bilateral cervical pain and thoracic pain, left chest pain, and bilateral
6  shoulder, arm, hand, finger, hip, leg, knee, ankle and foot pain. [AR at 296-97.] Factors that
7  precipitated this pain were stress, overuse, cold, and movement. Dr. Nery identified signs of
8  muscle weakness, gastritis, and impaired sleep, along with depression and anxiety as
9  psychological factors affecting her pain. [AR at 297.]

10       Plaintiff contends that the ALJ did not properly consider this opinion of a treating physician.

11       The opinion of a treating physician is generally entitled to greater weight than the opinions
12  of a physician who has not treated the claimant.  This is so because the treating physician is
13  employed to cure and has a greater opportunity to know and observe his patient than a physician
14  who only saw the claimant on one occasion.  The opinion of an examining physician, in turn, is
15  generally entitled to greater weight than the opinions of a physician who has not examined the
16  claimant.  Andrews, 53 F.3d at 1041.  This is not to say, however, that the opinion of even a
17  treating physician is "necessarily conclusive as to either a physical condition or the ultimate issue
18  of disability." Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989), citing Rodriguez v. Bowen,
19  876 F.2d 759, 761-62 & n. 7 (9th Cir. 1989).  If, for example, the opinion of a treating physician
20  is rejected in favor of that of a non-treating physician, and the opinion of the non-treating physician
21  is based upon independent clinical findings, the opinion of the non-treating physician can
22  constitute substantial evidence.  It is then for the ALJ to resolve the conflict.  Andrews, 53 F.3d
23  at 1041.  If, on the other hand, the opinion of the non-treating physician is based upon the same
24  clinical findings considered by the treating physician, the ALJ must cite specific and legitimate
25  reasons for rejecting the treating physician's opinion.  Id.

26       Plaintiff argues that the ALJ failed to "articulate specific and legitimate reasons based on
27  the record as a whole for rejecting the opinions of Dr. Nery." Joint Stipulation at 8. Plaintiff's
28  argument is not persuasive.

First, although plaintiff repeatedly refers to Dr. Nery as a treating physician (Joint Stipulation at 4, 6, 7) who had a "significant role in treating the claimant" (Joint Stipulation at 7), the ALJ was skeptical:  "I do not know what connection Dr. Nery has with [plaintiff] or if he is even a treating source since he is not listed on the current medication list as a prescriber . . . ." [AR at 18.] The record reveals that Dr. Nery attended to plaintiff during her bowel surgery in April, 1998. [AR at 179.] There is no evidence in the record that plaintiff saw Dr. Nery on any ongoing basis thereafter.  Dr. Nery was specifically asked as to the nature, frequency and length of contact with plaintiff.  However, his answer was non-responsive. [AR at 296.] When plaintiff filed her current application in April, 1999, she indicated that she last saw Dr. Nery on May 3, 1998. [AR at 124.] Therefore, there is considerable doubt whether in fact Dr. Nery even qualifies as a treating physician who is "likely to be the medical professional[] most able to provide a detailed, longitudinal picture of [plaintiff's] medical impairment(s)." 20 C.F.R. § 404.1527(d)(2); see Holohan v. Massanari, 246 F.3d 1195, 1202 n.2  (9th Cir. 2001)("Under certain circumstances, a treating physician's opinion on some matter may be entitled to little if any weight. This might be the case, for instance, if the treating physician has not seen the patient long enough to 'have obtained a longitudinal picture' of the patient's impairments.").

In any case, the ALJ rejected Dr. Nery's opinion primarily because of the internal consistencies in Dr. Nery's reports and because of the lack of supportive findings. [AR at 18.] The ALJ attempted to obtain Dr. Nery's records, but, according to the ALJ, no response was received. [Id.] Plaintiff essentially concedes at least that Dr. Nery's responses to the two questionnaires are "facially confusing." Joint Stipulation at 8.  However, plaintiff argues that it is clear that Dr. Nery intended to say that plaintiff is extremely limited. [Id.]   Of that there is no doubt.

Plaintiff also argues that the record as a whole supports Dr. Nery's assessment, citing various findings such as tenderness to palpation in the abdomen and back, and decreased range of motion due to pain as found by a consultative examiner, Dr. Lilian Y. Chang.  Joint Stipulation at 5; [AR at 254-59.] At the same time, plaintiff disputes Dr. Chang's conclusion that, these

1  findings notwithstanding, plaintiff could perform essentially medium work.[5] [AR at 259.]   Plaintiff

2  also cites a one-time finding of tender points along the spine (Joint Stipulation at 6, citing AR at

3  328), as well as various intermittent complaints of abdominal pain thereafter.  [Id., citing, e.g., AR

4  at 330-31, 334, 337, 339.]

5      However, the ALJ's assessment that the treatment record essentially revealed little in the

6  way of findings following her abdominal surgery is based upon substantial evidence, looking at

7  the record as a whole. [AR at 16.] For example, in August, 1998, four months following surgery,

8  plaintiff's physical examination was normal, and she was symptom-free. [Id.; see AR at 227; see

9  also AR at 221, 224.] Plaintiff's primary care physician at that time was Dr. Edgar Ochoa, who saw

10  plaintiff on numerous occasions during the year following surgery. [AR at 219, 222, 223, 224, 226,

11  228, 230.] There were no further significant symptoms reported until March, 1999, when she

12  complained of three days of abdominal pain after she ran out of Donnatol. [AR at 220.] At her

13  follow-up visit in April, 1999, plaintiff was again pain free. Dr. Ochoa did not indicate that plaintiff

14  should limit her activities in any way. [AR at 219.]   On September 16, 1999, plaintiff was seen

15  again for abdominal complaints for which she sought medication refills.  The physician noted that

16  her complaints were relieved with Haponol.  [AR at 346].  On January 7, 2000, plaintiff returned

17  with complaints of cramps and intermittent diarrhea because she had run out of Haponol the

18  previous months. The only restriction given to her was to avoid certain foods and to take

19  metamucil and her medications. [AR at 339.]  Although she again apparently complained of

20  abdominal pain on January 19, 2000, she was described in February, 2000, as a "well woman."

21  [AR at 337; see also AR at 336.] Also in February, 2000, plaintiff asked Dr. Sylvia Collazo, another

22  physician who had seen plaintiff on multiple occasions, to complete some disability paperwork.

23  [AR at 328, 329, 334, 336.]  Dr. Collazo declined on the basis that she did not have adequate

24  tools to evaluate plaintiff's lifting or carrying capacities. [AR at 334.] Objectively, there was a post-

25  surgical abdominal scar and diffuse mild to moderate tenderness in the abdomen.  However, a

26  CT scan of the abdomen and pelvis taken two weeks earlier was normal. [Id.]  In May, 2000,

27

28      [5]   "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or
carrying of objects weighing up to 25 pounds. . . ." 20 C.F.R. § 404.1567(c).

plaintiff again complained of chronic lower abdominal pain, which was treated symptomatically. Plaintiff was advised to keep a food diary and eat a high fiber diet.  Follow up with her primary care physician was recommended [AR at 330-32], but subsequent visits to the clinic revealed no complaints of abdominal pain. [AR at 328, 546.] In fact, on March 5, 2001, there were no complaints whatsoever.  [AR at 673.]

As to her musculoskeletal complaints, plaintiff is correct that there are complaints and findings. But intermittent complaints and scattered findings do not support the limitations asserted by Dr. Nery.  For example, Dr. Nery indicates that plaintiff is unable to use her hands for repetitive actions including simple grasping and fine manipulation.  [AR at 294; but see AR at 301.]  Plaintiff had wrist surgeries in the mid-1990s, but she was able to return to work thereafter, and there is no record of significant treatment near the date last insured.  Although Dr. Chang noted some decreased range of motion, she did not indicate that there were any restrictions in the use of plaintiff's upper extremities other than as she already found in limiting plaintiff to medium work, and there is nothing in the treatment record to indicate otherwise.

Plaintiff also had intermittent complaints of back and leg pain.  She reported in April, 1999, that she had chronic right lower extremity pain that had increased the previous week, when she started working. However, no significant findings were noted. [AR at 557.] Although Dr. Chang found some decreased range of motion of the hips two months later, as noted by the ALJ, her physical examination was otherwise unremarkable, and x-rays in June, 1999, were normal.  [AR at 16; see AR at 257, 259, 260.]

There are no further complaints of back pain until November, 1999, when plaintiff was found to have very tight trapezii.  Diagnosis was of muscle spasm and hyperextension/flexion injury.  Celebrex was prescribed. [AR at 344.] X-rays of the neck were entirely normal. [AR at 322.] A follow-up visit revealed continued complaints concerning the right side of her neck, and physical therapy was ordered. [AR at 341.] However, when Dr. Collazo examined plaintiff in February, 2000, her musculoskeletal range of motion in the upper and lower extremities was "good." [AR at 334.] In June, 2000, plaintiff complained of back pain of five months duration, but despite her complaints, she had stopped taking her Celebrex and was not taking any pain medication

9

1  whatsoever.  It was during this examination that the multiple tender points were noted [AR at 328],

2  but subsequent treatment records reveal no on-going neck or back complaints, and by November,

3  2000, her "myalgias" were resolved.  [AR at 546.]

4      In short, plaintiff essentially acknowledges the inconsistencies in Dr. Nery's report, and the

5  treatment record supports the ALJ's interpretation of the evidence as failing to show findings

6  supportive of Dr. Nery's limitations.

7      Plaintiff, on the other hand, argues that there is no evidence that the subpoena requesting

8  Dr. Nery's records was properly served.  However, it is still plaintiff's burden to prove that she is

9  disabled.  Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001).  Although as support for her

10  claims she submitted the reports of Dr. Nery, the ALJ is not required to accept the opinion of any

11  physician, including that of the treating physician, if that report is inadequately supported by

12  clinical findings. Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002).  Plaintiff was fully aware

13  of the ALJ's disbelief of Dr. Nery's opinion as reflected in his first decision, and of the ALJ's

14  attempt to obtain the records.  Nevertheless, plaintiff did not submit any records from Dr. Nery to

15  the Appeals Council, to the Court, or to the ALJ on remand.   In any case, in citing the

16  inconsistencies in Dr. Nery's reports and the lack of support in the treatment record, the ALJ

17  provided sufficiently specific and legitimate reasons based on substantial evidence in the record

18  for disregarding the opinion of Dr. Nery.  Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir.

19  1992)("Insofar as the ALJ rejected the opinions expressed by Dr. Lafrance, the inconsistencies

20  and ambiguities noted by the ALJ represent specific and legitimate reasons for doing so.");

21  Thomas, 278 F.3d at 957 ("The ALJ need not accept the opinion of any physician, including a

22  treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical

23  findings.").

24      **2.**   **Dr. Marlon Farley**

25      Dr. Farley completed a Residual Functional Capacity Questionnaire on December 17,

26  2003. [AR at 886-87.]  In this questionnaire, he assessed that plaintiff was capable of sitting two

27  hours at a time for a total of four hours in an eight-hour day, standing one hour at a time for a total

28  of two hours in an eight-hour day, and walking for one hour at a time for a total of one hour in an

eight-hour day.  According to Dr. Farley, plaintiff could only lift up to ten pounds occasionally, and she could not use her hands for repetitive actions such as grasping, pushing and pulling or fine manipulation. Additionally, Dr. Farley assessed significant postural limitations which he attributed to plaintiff's "arthritis."  [AR at 886.] He cited x-rays and muscle spasms as "objective signs of pain." [AR at 887.]  However, the record reveals no significantly abnormal x-rays.  To the contrary, x-rays of plaintiff's lumbar spine and right wrist taken in connection with the consultative examination of Dr. Chang were normal [AR at 260], and x-rays of her neck taken in November, 1999, were also normal. [AR at 322.] Nevertheless, Dr. Farley reported that plaintiff's pain was "severe" which would "preclude the activity precipitating the pain."  Although he indicated that plaintiff had other impairment-related physical limitations, he did not describe what they might be. [AR at 887.]

The ALJ rejected Dr. Farley's assessment:

> Exhibit 23F is a residual functional capacity questionnaire solicited by [plaintiff's] representative. It is the typical, accommodative, unsupported and grossly exaggerated in its limits form customarily submitted by county doctors if that is what Dr. Farley is.  His connection with [plaintiff] is not readily apparent from the record. Apparently, he had some problem understanding the form as his cross-outs reflect.  He cites no reason for the drastic sit, stand and/or walk limitations.   His assertion that [plaintiff] has basically no functional use of her hands borders on the absurd and is without support anywhere in this record.  His assertion that [plaintiff] endures "severe" pain that precludes activities is again fanciful and without any evidence in the record.  It is not supported by the mild, conservative care [plaintiff] receives from the county clinic.  In item 10, he asserts additional limits but does not bother to mention what they are.  I have carefully considered this form but find it thoroughly rebutted by the consultative examiners at Exhibits 4F and 6F and at Exhibit 22F and by the assessments of the state agency review physicians both initially and at the reconsideration level.

[AR at 399.]

/

/

/

/

/

1    Despite certain unfortunate and wholly improper pronouncements,[6] the ALJ provided

2    sufficiently specific and legitimate reasons for rejecting Dr. Farley's opinion.

3    First, it is not even established that Dr. Farley's assessment has more than minimal

4    relevance. It is dated more than four years after plaintiff's date last insured. Thus, even assuming

5    the accuracy of the assessment as of December, 2003, the treatment record does not support

6    that degree of limitation for the time period on or before September 30, 1999. [Supra.]

7    Next, if Dr. Nery's relationship with plaintiff is unclear, it is doubly so with Dr. Farley.

8    Plaintiff relies upon pages 638-40 and 655-56 in the Administrative Record as evidence that Dr.

9    Farley is her treating physician. Joint Stipulation at 9. Pages 655 and 656 are laboratory results

10   dated March 25, 2004, bearing Dr. Farley's name. However, there is no corresponding record of

11   consultation or treatment. The name of Dr. Sammy Shabestari is also shown on these pages, and

12   it is Dr. Shabestari who appears to have been plaintiff's primary care physician, not Dr. Farley. [AR

13   at 853, 856-58.]  While pages 638-40 indicate that Dr. Farley referred an individual named Maria

14   Rodriguez for x-rays, these referrals appear to belong to another Maria Rodriguez whose date of

15   birth and social security number differ from those of plaintiff. [Compare AR at 638-40 with AR at

16   72.]  Otherwise, plaintiff cites no treatment note or consultation report actually completed by Dr.

17   Farley.

18   However, even assuming that Dr. Farley was one of plaintiff's treating physicians, even

19   overlooking the fact that his report is dated more than four years after the date last insured, and

20   even  considering that some of the ALJ's remarks are objectionable and unwarranted, the

21   treatment record as a whole does not rebut the ALJ's conclusion that Dr. Farley's assessment is

22   unsupported and belied by the minimal conservative treatment prescribed for plaintiff.  [Supra.]

23

24

25    [6]    It is irrelevant that the report was solicited by plaintiff's counsel. Reddick v. Chater, 157

26   F.3d 715, 726 (9th Cir. 1998).  There is no evidence that county physicians write accommodative
     reports.  To the contrary, Dr. Collazo's refusal to complete disability papers on plaintiff's behalf

27   indicates otherwise.  Such generalizations by the ALJ deprive plaintiff of the individualized
     assessment to which she is entitled (Heckler v. Campbell, 461 U.S. 458, 467, 103 S.Ct. 1952,

28   1957, 76 L.Ed.2d 66, 74 (1983)), and do not rise to the level of specific and legitimate reasons.

1    Accordingly, there was no error in the ALJ's rejection of the unsupported opinions of Dr.

2    Nery and Dr. Farley.

3

4    **B.    PLAINTIFF'S MENTAL IMPAIRMENT**

5    Plaintiff argues that the ALJ erred in failing to find that plaintiff's mental impairment was

6    severe.  The ALJ found that plaintiff had no functionally limiting mental impairment as of the date

7    last insured. [AR at 17.] Plaintiff contends that this finding is not supported by substantial

8    evidence, relying on the consultative report of Dr. Divyakant Kikani, dated November 4, 1999 [AR

9    at 271-75], and the State Agency physician, Dr. Ed O'Malley. [AR at 276-84, 286-89.]

10   Dr. Kikani diagnosed plaintiff as suffering from depressive disorder, not otherwise specified,

11   rule out major depressive disorder, and anxiety disorder not otherwise specified. [AR at 273.] He

12   assessed that plaintiff was mildly impaired in activities of daily living and had moderate restrictions

13   in social functioning.  Concentration, persistence and pace at the time of the examination were

14   mildly to moderately impaired.  Plaintiff's ability to understand, remember and carry out simple

15   instructions was mildly impaired, but her ability to understand, remember and carry out complex

16   instructions was moderately impaired.  Plaintiff's ability to interact appropriately with coworkers,

17   supervisors and the public was moderately impaired, and her ability to cope with changes in a

18   routine work setting was mildly to moderately impaired.  Additionally, according to Dr. Kikani,

19   plaintiff might be expected to show moderate episodes of emotional deterioration under customary

20   work pressure in the usual work-like situation.  He believed that plaintiff needed psychological

21   testing for the purpose of diagnosis, prognosis and treatment, "and also to rule out secondary gain

22   factors." [AR at 274.]

23   The State Agency psychiatrist, Dr. O'Malley, assessed that the limitations as found by Dr.

24   Kikani would not be expected to last twelve months. [AR at 276.]  Dr. O'Malley opined that by

25   November, 2000, plaintiff would have slight restrictions of activities of daily living, moderate

26   difficulties in maintaining social functioning, would seldom have deficiencies of concentration,

27   persistence or pace, and would have one or two episodes of deterioration or decompensation in

28   work or work-like settings. [AR at 283.] Dr. O'Malley projected that plaintiff would have moderate

13

1   limitations in the ability to understand, remember, and carry out detailed instructions and interact

2   appropriately with the general public by November, 2000. [AR at 286-87.] There is also a stamped

3   entry reading: "CDR: there has not been significant medical improvement." [AR at 288.]

4       Upon remand, the ALJ had plaintiff examined by another consultative psychiatrist, Dr.

5   Romualdo Rodriguez, who saw plaintiff on August 26, 2004, nearly five years after her date last

6   insured. [AR at 860-67.] Dr. Rodriguez assessed plaintiff as being able to understand, remember

7   and carry out simple job instructions, do detailed instructions, relate and interact with supervisors,

8   coworkers and the public, and associate with day-to-day work activity, including attendance and

9   safety.  Dr. Rodriguez found that there was a slight impairment in plaintiff's ability to maintain

10  concentration and attention, persistence and pace, adapt to the stresses common to a normal

11  work environment,  maintain regular attendance in the work place, and perform work activities on

12  a consistent basis and without special supervision. [AR at 866-67.] Dr. Rodriguez also opined that

13  "if this patient took medication for her depression she would be able to function well and easily

14  recover within 12 months." [AR at 866.]

15      Plaintiff argues that Dr. Kikani's opinion is supported by the record, citing, for example, the

16  fact that her general practitioner prescribed medication and citing Dr. Nery's opinion that

17  depression exacerbated plaintiff's physical symptoms. Joint Stipulation at 17. Plaintiff argues that

18  the ALJ's rejection of Dr. Kikani's opinion was improper and that his reliance on the opinion of Dr.

19  Rodriguez was flawed. Joint Stipulation at 18.  Plaintiff seeks an award of benefits based on Dr.

20  Kikani's opinion and the frequent diagnoses of depression in the record.  Joint Stipulation at 19.

21      As a preliminary matter, the ALJ's rejection of Dr. Kikani's opinion is objectionable on

22  several levels.  The ALJ wrote:

23          Unfortunately, the California State Agency sent [plaintiff] to Dr. Divy
        Kikani for a psychiatric consultative examination.  Dr. Kikani is not

24          Board certified and this office requested long ago that he not be used
        in cases from our venue.  His reports are almost identical in format

25          and operative language as if coming from a computer program used
        as the basis for every report.  I have never seen a report from this

26          examiner in which the claimant, despite his or her educational, social
        or ethnic backgrounds, are not reported to have complained of

27          "depressed mood, crying spells, insomnia, feelings of helplessness,
        hopelessness, and despair."  It is extremely unlikely that every client

28          referred to him by the State Agency should have the same

1
2
3
4

> remarkable constellation of symptoms.  I have never seen a report from him with a GAF higher than 50.  The assessments are always for a GAF of 50 whether the client admits being fairly active or asserts vegetation.  The State Agency Board certified psychiatrists uniformly ignore his reports.  Dr. Kikani reported all symptoms as being current as of the date of the evaluation but never related any of them back to a time on or before the date last insured.

5 [AR at 18.]

6 First, although the Commissioner's regulations provide that generally greater weight be

7 given to opinions of specialists, they do not require that a physician be Board certified to provide

8 medical evidence.  See 20 C.F.R. § 404.1513(a); 20 C.F.R. § 404.1527(d)(5).  Indeed, in citing

9 Dr. Kikani's lack of Board certification, the ALJ appears to be applying a double standard.  Dr.

10 Rodriguez is not Board certified either. [AR at 867.]

11 Next, inasmuch as everyone who is examined by Dr. Kikani presumably is sent to him by

12 the State Agency for evaluation of a mental impairment, it would not be all that unusual for those

13 individuals alleging depression to have the same constellation of symptoms common to a

14 diagnosis of depression, such as "depressed mood, crying spells, insomnia, feelings of

15 helplessness, hopelessness, and despair." See § 12.04, Appendix 1, Subpart P, 20 C.F.R. Part

16 404.

17 Last, it is wholly improper of the ALJ to determine, based on evidence not in the record,

18 that Dr. Kikani's reports are unreliable.  Reed v. Massanari, 270 F.3d 838, 841-45 (9th Cir. 2001).

19 On the other hand, as noted by the ALJ, Dr. Kikani's assessment comes after plaintiff last

20 met disability insured status, as does the report of Dr. Rodriguez.  Both Dr. Kikani and Dr.

21 Rodriguez are examining physicians.  Therefore, neither is entitled to greater deference than the

22 other, and inasmuch as Dr. Rodriguez's opinion is based upon his independent clinical findings,

23 it was for the ALJ to resolve the conflict.  Andrews, 53 F.3d at 1041.

24 Clearly, substantial evidence supports the ALJ's assessment by the time Dr. Rodriguez saw

25 plaintiff.  At the second hearing, plaintiff offered no significant complaints of depression.  Although

26 she did not wish to "belabor the record by repeating everything" in the transcript of the prior

27 hearing [AR at 891], on the other hand, when asked what prevented her from working, plaintiff

28 answered that it was arthritis pain in her legs and hands, her stomach, and her blood pressure.

[AR at 893.]  Plaintiff also complained of left hip and hand pain, her eyesight being "short," and dizziness. [AR at 895.] Plaintiff did not implicate depression, anxiety, or any other mental impairment as preventing her from working, nor did plaintiff recite any significant subjective mental limitations, except to say that she did not go to church every week because "sometimes" she feels depressed. [AR at 898.]

The ALJ found that plaintiff's daily activities as related to Dr. Rodriguez did not indicate any significant functional mental limitations. [AR at 397; see AR at 863; see also AR at 874-75, 897-98.]  As noted by the ALJ, plaintiff never underwent psychiatric treatment or counseling, although she was prescribed medication from her general practitioners, but, as previously noted, plaintiff was non-compliant. [AR at 397.]

However, Dr. Rodriguez' examination took place nearly five years after plaintiff last met insured status, and plaintiff contends that "there does not exist even a scintilla of evidence that [his] opinions relate back in time to the period discussed by Dr. O'Malley and Dr. Kikani." Joint Stipulation at 18.  Dr. Kikani's opinion, in contrast,  was written only one month after plaintiff's date last insured.  Thus, a rejection of Dr. Kikani's opinion solely on the basis that his assessment is as of a date beyond the date last insured would be somewhat cavalier absent other evidence that supports the ALJ's conclusion that plaintiff's mental impairment during the relevant time period was non-severe, and that it was Dr. Rodriguez' assessment that more accurately described plaintiff's condition throughout.  Here, there is such evidence.

Contrary to plaintiff's claims of a significant longitudinal history, the treatment record reveals little evidence that plaintiff had more than intermittent, short-lived complaints of depression at or near the date last insured through the date of Dr. Rodriguez' report.

In June, 1998, a psychiatric component was suggested when plaintiff's "multiple complaints" were unsupported by an unremarkable physical examination.  At that time, plaintiff appeared "saddened." [AR at 231.] However, no psychotropic medications were prescribed, and there is no indication of any psychiatric complaint again until a year later, on June 21, 1999.

At that time, plaintiff was diagnosed with "possible depression" of two weeks duration. She complained of diminished interest in her usual activities and diminished energy, diminished ability

to concentrate, and diminished appetite, but she denied feelings of guilt or worthlessness.  The diagnosis was of adjustment disorder with depressed mood versus major depressive disorder. Dr. Ochoa did not feel that plaintiff met the criteria for major depression at that time, but rather that her "circumstances seem to be related to her current unemployment."  She was given a trial of Prozac. [AR at 556.]  In July, 1999, plaintiff was seen by Dr. Collazo, complaining of agitation, poor sleep, and feelings of depression.  However, plaintiff reported that her concentration had improved, there were no feelings of guilt, and her appetite was normal.  Dr. Collazo observed, nevertheless, that plaintiff appeared "very anxious." [AR at 554.] Prozac was prescribed with three refills. [AR at 554-55.]

Subsequent visits reveal no further psychiatric complaints, abnormal psychiatric findings, or psychiatric medication until more than two years later, in December, 2001, well after the date last insured.  [AR at 328, 548, 551, 673; see AR at 326, 546, 549-50, 552, 553.]   At that time, plaintiff again complained of problems with concentration, memory, insomnia, and multiple somatic complaints.  She was prescribed Zoloft, and Dr. Elias Sanchez "instructed the patient to follow up with outpatient counseling." [AR at 536.] However, by April, 2002, plaintiff's "previously diagnosed" depression was controlled with Zoloft, and there is no indication that plaintiff ever sought counseling as instructed by Dr. Sanchez. [AR at 694.]   There were no further complaints or findings in subsequent months [AR at 515, 517, 518, 519, 520] until January, 2003 [AR at 513, 514], but when next seen in June, 2003, no psychiatric complaints are reported. [AR at 512; see also AR at 507, 508, 509.]

Thus, the treatment record fails to disclose persistent psychiatric complaints or ongoing impairment.  Complaints are sporadic, intermittent, and generally of short duration at or near the date last insured and for the period thereafter.  Thus, substantial evidence supports the ALJ's resolution of the conflicting medical evidence.

Plaintiff, however, correctly points out that Dr. O'Malley's projection of plaintiff's disability would generally indicate a severe impairment, finding as he did a more than mild impairment in her social functioning and one or two episodes of decompensation.  Joint Stipulation at 16.  20 C.F.R. § 404.1520a(d)(1).   Plaintiff also argues that Dr. O'Malley's indicating a lack of

1  improvement was supported by the record as a whole. Joint Stipulation at 17.  Plaintiff's

2  arguments are unavailing.

3          As noted by the ALJ, the stamp indicating that there was no improvement appears to have

4  been in error. [AR at 17.]  Medical improvement is an issue in a continuing disability review

5  ("CDR"), when the continuing disability of an individual already deemed disabled comes up for

6  periodic review.  20 C.F.R. § 404.1589.  This is not the case here.

7          Next, Dr. O'Malley's projected disability is just that -- a projection. Moreover, as a non-

8  examining physician, his opinion is not entitled to any particular deference, and his opinion,

9  without more, cannot constitute substantial evidence.  Andrews, 53 F.3d at 1042.   At the time

10  he made his assessment in December, 1999, he obviously did not have the benefit of any ongoing

11  treatment records beyond that date, and subsequent treatment notes reveal no further psychiatric

12  complaints, abnormal psychiatric findings, or psychiatric medication for another two years until

13  December, 2001, well after the date last insured.[7]  [AR at 328, 548, 551, 673; see AR at 326, 546,

14  549-50, 552, 553; see also Joint Stipulation at 18.]

15          Plaintiff asserts, however, that the lack of treatment "in the context of a mental impairment"

16  is not determinative.  Joint Stipulation at 21.  However, plaintiff's situation is not one where she

17  did not recognize her depression.  She reported when she had symptoms.  Although at the first

18  hearing she indicated that she did not seek treatment because her doctors did not send her to a

19  psychiatrist [AR at 31], when her physician did advise her to seek counseling [AR at 536], she did

20  not do so, most likely because, according to her treating physician, within a few months, her

21  "previously diagnosed" depression was controlled with medication.  [AR at 694.]  See Montijo v.

22  Secretary of Health and Human Services, 729 F.2d 599, 600-01 (9th Cir. 1983); see also Brown

23  v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004) ("'If an impairment can be controlled by treatment

24  or medication, it cannot be considered disabling.'") (internal citations omitted).

25

26

_____

27      [7]     Plaintiff's suggestion that Dr. O'Malley also relied on the opinion of Dr. Nery is without
   merit.   Joint Stipulation at 17. Dr. Nery's report is dated four months after Dr. O'Malley's
28  assessment. [AR at 288, 297.] Dr. Nery's opinion, moreover, has been properly rejected.

1    Therefore, substantial evidence based on the record as a whole supports the ALJ's finding

2    of a non-severe mental impairment.

3

4    **C.    THE ALJ'S CREDIBILITY FINDING**

5    Because plaintiff produced medical evidence of underlying impairments that are reasonably

6    likely to cause the symptoms alleged, medical findings are not required to support their alleged

7    severity. Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991); see also Light v. Social Security

8    Admin., 119 F.3d 789, 792 (9th Cir. 1997) ("[B]ecause a claimant need not present clinical or

9    diagnostic evidence to support the severity of his pain ... a finding that the claimant lacks

10   credibility cannot be premised wholly on a lack of medical support for the severity of his pain.");

11   Byrnes v. Shalala, 60 F.3d 639, 641-42 (9th Cir.1995) (applying Bunnell to subjective physical

12   complaints); see also Goodenow-Boatsman v. Apfel, 2001 WL 253200, *3 (N.D.Cal. Feb. 27,

13   2001) ("The same rule applies to other types of subjective symptoms beside pain.").

14   The ALJ can reject plaintiff's allegations "only upon (1) finding evidence of malingering, or

15   (2) expressing clear and convincing reasons for doing so." Benton v. Barnhart, 331 F.3d 1030,

16   1040 (9th Cir. 2003).   The ALJ may consider the following factors in weighing a plaintiff's

17   credibility:  (1) his reputation for truthfulness; (2) inconsistencies either in the plaintiff's testimony

18   or between the plaintiff's testimony and his conduct; (3) his daily activities; (4) his work record; and

19   (5) testimony from physicians and third parties concerning the nature, severity, and effect of the

20   symptoms of which he complains.   Thomas, 278 F.3d at 958-59 (9th Cir. 2002); see also 20

21   C.F.R. § 404.1529(c). "General findings are insufficient." Reddick v. Chater, 157 F.3d 715, 722

22   (9th Cir. 1998).  The ALJ must state which testimony is not credible and identify the evidence that

23   undermines the plaintiff's complaints. Id.; Benton, 331 F.3d at 1041.  If properly supported, the

24   ALJ's credibility determination is entitled to "great deference."  Green v. Heckler, 803 F.2d 528,

25   532 (9th Cir. 1986).

26   As there is no evidence of malingering, the ALJ's reasons for rejecting plaintiff's credibility

27   needed to be clear and convincing to withstand reversal or remand. Benton, 331 F.3d at 1040.

28   The Court concludes that the ALJ provided sufficiently clear and convincing reasons for finding

plaintiff not entirely credible.  First, the ALJ cited the lack of objective findings.   He noted, for example, that despite multiple somatic complaints concerning her gastrointestinal system, there is no evidence of any nutritional deficits or abnormal laboratory findings.  [AR at 397; see, e.g., AR at 856.]  The ALJ also noted that plaintiff's complaints of spinal pain were unsupported by normal x-ray findings and minimal clinical findings. [AR at 16, 397; see AR at 257-58, 260, 334, 876-78.] Likewise, despite complaints of vision problems, there was no evidence of any significant visual impairment.  [AR at 16; see AR at 261.]   Although the lack of objective medical evidence to support the symptoms alleged by a claimant cannot be the sole reason to discredit testimony, it certainly can be one reason that can be considered to reject such testimony.  "The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints." Luna v. Bowen, 834 F.2d 161, 164-65 (10th Cir. 1987) (emphasis added) (quoting Polaski v. Heckler, 751 F.2d 943, 948 (8th Cir. 1984), vacated and remanded on other grounds, 476 U.S. 1167, 106 S.Ct. 2885, 90 L.Ed.2d 974 (1986)); see also Bunnell, 947 F.2d at 345-47 (an "adjudicator may not discredit a claimant's testimony of pain and deny disability benefits solely because the degree of pain alleged by the claimant is not supported by objective medical evidence.") (emphasis added).

The ALJ also used ordinary techniques of credibility assessment. Fair v. Bowen, 885 F.2d 597, 604 n.5 (9th Cir. 1989) (the court saw "no reason why ordinary techniques of credibility evaluation should not be applied in SSA disability hearings. For example, if a claimant has a reputation as a liar, or has made prior statements inconsistent with his claim of pain, or is found to have been less than candid in other aspects of his testimony, that may be properly taken into account in determining whether or not his claim of disabling pain should be believed.").  The ALJ cited the examination of Dr. Rodriguez, who reported that plaintiff told him that she had stopped working approximately twelve years earlier. [AR at 398.] "When asked why she has not worked in the last 12 years she then changed her mind and talked about,  'Well, I have small jobs here and there' but insisted they were nothing and avoided questions."  [AR at 862.] Also as noted by the ALJ, plaintiff first told Dr. Rodriguez that her daughter did all of the household chores, but

1  when asked why she could not do them, "she then changed her mind and said, 'Well, at times I

2  do it.'" [AR at 398; AR at 863; see AR at 243; compare AR at 160-161, 272, 874-75.]

3       Next, the ALJ cited plaintiff's non-compliance with medication. [AR at 397; see AR at 861;

4  see also AR at 328, 339, 559.] This, too, is a legitimate consideration in the evaluation of

5  credibility. Fair, 885 F.2d at 604 (the plaintiff's lack of motivation to follow his doctor's advice was

6  one of the factors to be considered in assessing the severity of his complaints.).

7       In his first decision, which the ALJ incorporated by reference and which was "the decision

8  on remand as supplemented" [AR at 397], the ALJ also cited plaintiff's "minimal and conservative

9  treatment" by a general practitioner.  [AR at 18.] Minimal conservative treatment is likewise a valid

10 consideration in assessing the severity of plaintiff's complaints. [Id.]

11       Last, the ALJ also cited plaintiff's daily activities as recited to Dr. Rodriguez. [AR at 397.]

12 She reported that she is able to bathe and dress herself, cook, perform household chores, go

13 shopping, accompany her daughter to the casino, and do some gardening.   Plaintiff also

14 described no difficulties in getting along with others.   [AR at 863.]  These activities are not much

15 different than when plaintiff filed her application.  In her Daily Activities Questionnaire, despite

16 complaints of constant pain and difficulties with concentration and memory, plaintiff stated that

17 her day "revolve[d] around light cleaning" (of her bedroom only), preparing meals and watching

18 television.  She was able to do light dusting and cleaning such as vacuuming and laundry, but she

19 was "unable to move furniture, lift heavy objects or wash heavy loads such as bed comforters."

20 [AR at 160, 161.] She was also able to do her own shopping, and she required assistance only

21 with transportation and with lifting heavy bags. [AR at 161.]   She had no difficulties with personal

22 hygiene. [AR at 160.] She also enjoyed visiting her children and "observing [her] grandchildren

23 play." [AR at 161, 162.] Plaintiff's ability to perform these activities was also noted by her friend.

24 [AR at 165-71.] Although it is true, as plaintiff argues, that she need not "'vegetate in a dark room'"

25 to be eligible for benefits (Joint Stipulation at 24, quoting Cooper v. Bowen, 815 F.2d 557, 561

26 (9th Cir. 1987) (internal quotations omitted)), on the other hand, daily activities is a legitimate

27 basis upon which to base a credibility finding.  Fair, 885 F.2d at 604 ("[I]n addition to being

28 unsupported by objective medical evidence, ... [t]he ALJ evidently reasoned along the lines

1    sketched above: If Fair's pain is not severe enough to motivate him to seek treatment or follow

2    his doctor's advice, and if Fair remains able to perform ordinary household and personal tasks,

3    then he has not carried his burden of proving that his pain prevents him from returning to his

4    former job.").

5         The ALJ, therefore, cited sufficiently specific, clear and convincing reasons for finding

6    plaintiff not credible.

7

8                              **VI.**

9                      **<u>CONCLUSION</u>**

10        Accordingly, **IT IS HEREBY ORDERED** that: 1. plaintiff's request for reversal, or in the

11    alternative, remand, is **denied**; and  2. the decision of the Commissioner is **affirmed**.

12        **IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the

13    Judgment herein on all parties or their counsel.

14

15    DATED: August 21, 2006                _____

16                                     /S/
                                    PAUL L. ABRAMS
                        UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

25

26

27

28